UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------x

CELESTE J. MATTINA, Regional Director,
Region 2, National Labor Relations Board,
for and on Behalf of the NATIONAL LABOR
RELATIONS BOARD,

              Petitioner,

      -v-                                          No.  10 Civ. 2474 (LTS)

ARDSLEY BUS CORPORATION A/K/A
GENE'S BUS COMPANY,

              Respondent.

-------------------------------------------------------x

## Opinion Granting Temporary Injunctive Relief Pursuant to 29 U.S.C. § 160(j)

              Celeste J. Mattina ("Petitioner" or "Mattina"), Regional Director for Region 2 of

the National Labor Relations Board (the "Board" or the "NLRB") brings this action seeking

temporary injunctive relief, pursuant to Section 10(j) of the National Labor Relations Act

("NLRA" or the "Act"), 29 U.S.C. § 160(j).  Petitioner seeks an injunction pending the final

disposition of proceedings before the Board against Ardsley Bus Corp. ("Respondent" or

"Ardsley") in which the General Counsel of the Board ("General Counsel" or "G.C.") has alleged

that Respondent has engaged in, and is engaging in, unfair labor practices in violation of Sections

8(a)(1) and (5) and 8(d) of the NLRA.  The Court has jurisdiction of this action pursuant to 28

U.S.C. § 1331 and 29 U.S.C. §  160(j).  The Court has reviewed thoroughly the parties'

submissions and heard oral argument on April 13, 2010.  For the following reasons, the Court

has determined the matter on the basis of the administrative record and grants the Petition.

<u>BACKGROUND</u>

Respondent provides school bus services to Westchester County school districts. (Petition, Ex. A, Part 4 ("Part 4") at 121:24-126:6.)  Respondent has approximately 250 employees.  (<u>Id</u>. at 430:9-11.)  The Transport Workers Union of Greater New York, Local 100, AFL-CIO (the "Union") represents more than 200 of Ardsley's employees.  (Pet'r Br. at 7; Resp. at 15; Tr. of April 13, 2010, oral argument at 11:13-15.)  The Company and the Union first entered into a collective bargaining agreement in September 2000; that agreement expired on June 30, 2002.  (Petition, Ex. A, Part 2 ("Part 2"), G.C. Ex. 53[1] (2006 Memorandum of Agreement ("MOA") between the Union and Respondent extending and attaching the original CBA) (the "CBA").)  The agreement was modified and extend twice: for the periods July 1, 2002, through June 30, 2006, and July 1, 2006, through June 30, 2009, pursuant to MOAs.  (<u>See</u> <u>id.</u>; Part 2, G.C. Ex. 66 (2002 MOA).)  The 2000 CBA and the MOAs provide for the picking of bus routes by employee seniority.  Information about the bus routes is required to be posted. (Part 2, G.C. Exs. 53, 66.) The CBA also provides procedures for addressing "Grievances, Disputes and Arbitration."  (CBA, Section 14.)

In September 2007 the Union replaced its shop steward and filed several grievances relating to the Company's alleged breaches of the CBA, including failure to pay wages and other compensation, refusal to apply the seniority provisions, and improper maintenance of buses.  (Part 4 at 130:15-140:18; Petition, Ex. A, Part 5 ("Part 5") at 558:7-559:3; 560:13-24.)  The Union undertook a "publicity" campaign, which included safety inspections of

---

[1]      Citations to "G.C. Ex. __" refer to the General Counsel's exhibits introduced at the underlying administrative hearing.  Citations to "R. Ex. __" refer to Respondent's exhibits at that hearing.

buses and the display of an inflatable rat at the bus facility.  (Part 4 at 131:12-22, 143:12-144:16.)
As much of the evidence introduced during the underlying administrative proceeding showed,
tensions between Respondent and the Union consistently mounted until contract renewal
negotiations broke down in June 2009.  In May and June 2008, Respondent refused to provide
the Union with information regarding the summer bus routes and canceled meetings to discuss
the issue.  (Part 5 at 593:13-612:24.)  In July and August 2008, the Union filed grievances
concerning summer route pay and the failure to hold an employee "pick" (i.e., bus route
selection).  (Petition, Ex. A, Part 1 ("Part 1"), G.C. Exs. 16, 48.)  A pick was held in August
2008, and was attended by Union representatives.  The Union later discovered, however, that
some routes had been excluded from the pick in violation of the CBA.  (Part 1, G.C. Ex. 25.)
The Union filed "numerous" grievances in September and October 2008.  (Pet'r Br. at 10; Part 1,
G.C. Exs. 31-34, 38-40, 43.)  In the following months, the company refused to participate in
mandatory "step two" meetings to address the many pending grievances (Part 2, G.C. Exs. 73-74;
Part 5 at 636:7-13), although it did agree six months later to arbitrate some grievances.

      In December 2008, the Company allegedly "deal[t] directly" with the Company's
mechanics in soliciting statements regarding their receipt of certain compensation and with other
employees in drafting and procuring signatures on statements indicating that the employees
acceptance of the summer route pick had not been coerced.  (Part 4 at 328:8-332:23; Petition, Ex.
A, Part 6 ("Part 6") at 1129:19-1136:19; 1342:3-21; 1054:22-1056:12.)  In May 2009 the
Company failed to respond to the Union's information request, made in preparation for
negotiation of the next MOA.  (Part 2, G.C. Ex. 75; Part 5 at 644:15-646:4.)

      After several delays by the Company, it began negotiating with the Union in June
2009 but soon walked out of negotiations because a Union representative who was presenting the

Union's position was reading from notes that he refused to provide to the company. (Part 5 at 522:6-525:22.) Around that time, but before the June 30, 2009, expiration of the CBA, a petition to decertify the union was presented to the NLRB by several Ardsley employees. (Petition, Ex. A, Part 3 ("Part 3"), R. Ex. 6A (letter dated June 16, 2009, from employees addressed to Tiktin and Gillison regarding their attempt to deliver the petition on June 15, 2009, to the N.L.R.B.), R. Ex. 6B (decertification petition).) The employees who had attempted to deliver the decertification petition were told by NLRB personnel that they could not make such a petition in the final 60 days of a contract term. (Part 3, R. Ex. 6A.) In August 2009, the Company held a bus route "pick" that it refused to allow the Union to attend, and instituted changes in employees' terms and conditions of employment regarding pay rates, assignment of charter routes, holidays and leave, and hours of work. (Part 6 at 1190:9-1202:7; Part 1, G.C. Ex. 19 ("Ardsley Bus Company Employee Hourly Wages Company Policies [and] Rules September 1, 2009 - August 31, 2010"); 1332:9-1333:3 see also Pet'r Br. at 28-31 (discussing the changes in terms and conditions of employment reflected in G.C. Ex. 19).)

The Union filed four charges with the NLRB in 2008 and 2009, the period during which the relationship between the Union and Respondent deteriorated. The General Counsel of the NLRB, by the Regional Director, filed complaints with respect to all four charges. The complaints were eventually consolidated and were the subject of a hearing before an Administrative Law Judge ("ALJ") in November 2009. The ALJ issued a decision on March 2, 2010, and errata on March 15, 2010. (Petition, Exs. D ("March 2, 2010, Decision"), E ("March 15, 2010, errata").) The ALJ found that Respondent had committed a number of unfair labor practices and that it had unlawfully withdrawn recognition from the Union in June 2009 and thus unlawfully made subsequent unilateral changes to employees' terms and conditions of

employment.  (March 2, 2010, Decision at 41-42.)  The ALJ characterized the unfair labor

practices allegations as falling into three broad categories: (1) "allegations involving Cesar

Uchofen, a driver who was named by the Union as an employee union representative" (March 2,

2010, Decision at 4); (2) "allegations concerning seniority clauses and practices," namely

allegations that Respondent unilaterally modified, and thus breached, the seniority provisions of

the CBA and that it refused to respond to the Union's request for information regarding bus route

assignments necessary for the Union's monitoring and enforcement of the CBA and for

meaningful bargaining (id. at 4-5); and (3) "allegations concerning the negotiations in June 2009

for a new contract," including allegations that Respondent refused to bargain in good faith,

instead deliberately running out the clock on the then existing contract in order to then

unlawfully withdraw recognition from the Union and unilaterally change terms and conditions of

employment (id. at 5).

DISCUSSION

*The NLRB's Motion to Try the Petition on the Basis of the Administrative Record*

                The General Counsel moves to try the Petition for a temporary injunction on the

basis of the record before the ALJ.  (Docket entry no. 4.)  Respondent does not dispute that the

Court has discretion to try the Petition on the basis of the underlying administrative record.  See

Silverman v. J.R.L. Food Corp., 196 F.3d 334, 337 (2d Cir. 1999) (noting that the district court

had granted the Board's motion to decide the Petition on the basis of the record of the

administrative proceeding).  Rather, Respondent argues that an evidentiary hearing should be

held because the ALJ, in noting during the hearing that Respondent would prevail on certain

issues if it succeeded in making appropriate showings, "blind sided" Respondent into believing

that it had actually prevailed on those issues, causing Respondent to abstain from introducing

relevant evidence.  However, the evidence that Respondent now seeks to introduce relates primarily to Respondent's belief that the Regional Director holds a bias in favor of unions that colored the NLRB's conduct of its investigation into the charges that resulted in the administrative proceeding at issue.  Respondent's evidence, which apparently consists of hearsay statements that NLRB personnel told some Ardsley employees that "unions are good" (Resp. at 11), is irrelevant to the question of whether the temporary relief sought in the instant action is warranted.  Respondent also refers to the Union's alleged bullying and anti-Semitic conduct.  Those accusations, discussed briefly below, are without merit and are irrelevant to the Court's inquiry as to whether reasonable cause exists to believe that Respondent engaged in unfair labor practices.  Finally, Respondent argues that the ALJ prevented it from introducing evidence of the Union's loss of majority support.  Respondent represents that its evidence shows that Respondent did not participate in, or solicit, employees' efforts to have the Union decertified.  Such evidence is immaterial because, as is explained below, an employer may not rely on employee disaffection from a union that it has caused.  The ALJ found, and the record indicates, that Respondent's unfair labor practices caused any disaffection that Respondent might prove.  Respondent's evidentiary proffers are thus insufficient to demonstrate the necessity of additional evidentiary proceedings on the instant Petition.  Petitioner's motion to try the Petition on the basis of the record before the ALJ is granted.

*The NLRB's Petition for a Temporary Injunction*

The NLRB may seek an injunction against unfair labor practices once it has filed a complaint pursuant to 29 U.S.C. § 160(b).  29 U.S.C. §  160(j).  "In this Circuit, in order to issue a § 10(j) injunction, the district court must apply a two-prong test.  First, the court  must find reasonable cause to believe that unfair labor practices have been committed.  Second, the court

must find that the requested relief is just and proper." <u>Hoffman ex rel. N.L.R.B. v. Inn Credible Caterers, Ltd.</u>, 247 F.3d 360, 365 (2d Cir. 2001).

"[W]hen considering § 10(j) petitions, [courts] give considerable deference to the NLRB Regional Director. As [the Second Circuit] ha[s] noted, '[w]ith respect to issues of fact, the Regional Director should be given the benefit of the doubt . . . and on questions of law, the Board's view should be sustained unless the court is convinced that it is wrong.'" <u>Id.</u> (alterations in original) (quoting <u>Kaynard v. Palby Lingerie, Inc.</u>, 625 F.2d 1047, 1051 (2d Cir. 1980)). <u>See also</u> <u>Mattina ex rel. N.L.R.B. v. Kingsbridge Heights Rehabilitation and Care Center</u>, 329 Fed. App'x 319, 321 (2d Cir. 2009) ("In determining whether reasonable cause exists, a district court should show '[a]ppropriate deference . . . to the judgment of the NLRB, and . . . should decline to grant relief only if convinced that the NLRB's legal or factual theories are fatally flawed.'" (alterations in original) (quoting <u>Silverman v. Major League Baseball Player Relations Comm., Inc.</u>, 67 F.3d 1054, 1059 (2d Cir. 1995))); <u>id.</u> at 322 ("the 'reasonable cause' prong contemplates that a Section 10(j) injunction will routinely be issued despite the existence of unresolved issues before the Board"); <u>J.R.L. Food Corp.</u>, 196 F.3d at 335 (noting that "[a] court considering whether to grant temporary equitable relief pursuant to § 160(j) should give '[a]ppropriate deference' to the contentions of the NLRB and should decline to grant relief only if the NLRB's legal or factual premises are 'fatally flawed'" and that "[a]n Administrative Law Judge's factual findings are part of the record and cannot be ignored" (citations omitted)); <u>Kaynard v. Mego Corp.</u>, 633 F.2d 1026, 1031 (2d Cir. 1980) ("[T]he Regional Director's version of the facts should be sustained if within the range of rationality, . . . inferences from the facts should be drawn in favor of the charging party, and . . . even on issues of law, 'the district court should be hospitable to the views of the General Counsel, however novel.'" (quoting <u>Danielson v. Joint</u>

Board of Coat, Suit and Allied Garment Workers' Union, I.L.G.W.U., 494 F.2d 1230, 1245 (2d

Cir. 1974))).[2]  The Court finds, for substantially the reasons stated in the March 2, 2010,

Decision, that there is reasonable cause to believe that Respondent committed the unfair labor

practices found by the ALJ.  The Court discusses below those findings by the ALJ that

Respondent specifically challenges.

  As an initial matter Respondent, citing 29 U.S.C. § 164(c), challenges the

NLRB's jurisdiction over the dispute.[3]  That section permits the NLRB to decline to assert

jurisdiction "over any labor dispute involving any class or category of employers, where, in the

opinion of the Board, the effect of such labor dispute on commerce is not sufficiently substantial

to warrant the exercise of its jurisdiction."  29 U.S.C. § 164(c)(1).  It is not an appropriate vehicle

for a challenge to the NLRB's decision to exercise jurisdiction.  The record demonstrates, in any

event, the requisite nexus between Respondent's activities and interstate commerce.  The ALJ

found, on the basis of three Commerce Questionnaires and an Affidavit by the Company's owner

showing that Respondent has annual gross revenue of more than $10,000,000, sells

approximately $4,000 in services across state lines, and purchases more than $50,000 in goods

---

  [2] Respondent argues that there must be "substantial evidence" in support of the
Petition in order for reasonable cause to exist.  (Resp. at 10.)  The case it cites,
Salmon Run Shopping Center LLC v. N.L.R.B., 534 F.3d 108, 113 (2d Cir. 2008),
involved a petition to review a final order of the Board (and a cross-petition to
enforce the order).  However, even in that context, "[s]ubstantial evidence means . . .
such relevant evidence as a reasonable mind might accept as adequate to support a
conclusion."  Id. (internal quotation marks and citations omitted).  "[R]eversal based
upon a factual question will only be warranted if, after looking at the record as a
whole, [the Court is] left with the impression that no rational trier of fact could reach
the conclusion drawn by the Board."  Id. (internal quotation marks and citations
omitted).  That standard, even if it were applicable here, is easily met in the instant
case for the reasons stated in this Opinion.

  [3] This Court's jurisdiction is not in dispute.

and materials from directly outside the state, that the Board had jurisdiction.  (March 2, 2010,

Decision at 4.)  The Board itself denied Respondent's pre-hearing motion to dismiss for lack of

jurisdiction.  (See id. at 4 n.3.)

Respondent also challenges the sufficiency of the evidence supporting a number

of the ALJ's findings of violations of the NLRA.  However, in light of the "considerable

deference" the Court must give Petitioner, as well as the ample record, including the ALJ's

factual findings, and the evidence supporting the ALJ's conclusions, as discussed below, the

Court finds that there is reasonable cause to believe that unfair labor practices were committed as

found by the ALJ.

The Challenged Findings

Respondent contends that the ALJ's finding that Thomas Gillison, Respodent's

general manager, assaulted Cesar Uchofen in November 2008 is controverted by the testimony of

Rosie Clayton, an Ardsley employee.  (Resp. at 17-18.)  However, the testimony cited by

Respondent, to the effect that Ms. Clayton "heard commotions" but did not see the altercation at

issue, does not contradict the finding that Gillison physically assaulted Uchofen.  Clayton

testified that she saw Uchofen leaving the trailer in which the incident occurred, that Gillison was

standing in the doorway, and that Uchofen "kept saying . . . 'you're going to put your feet on me?

You want to kick me?' And he just kept yelling saying that."  (Part 6 at 1105:6-1106:25.)  The

ALJ found that "[e]mployee Rosie Clayton essentially corroborated Uchofen's account."  (March

2, 2010, Decision at 13.)  The ALJ also credited Uchofen's testimony that Gillison had "start[ed]

ranting in front of other employees that Uchofen was the new boss here and that 'he's going to

run the company now'" and made "sarcastic comments to the effect that Uchofen was the new

boss."  (March 2, 2010, Decision at 13.)  Therefore, there is reasonable cause to believe that the

November 2008 assault in fact occurred, and that it was in response to Uchofen's protected

activities, in violation of Section 8(a)(1) of the NLRA.[4]

        Respondent next argues that the NLRB's charges, and the ALJ's findings, with

respect to its failure to conduct "summer picks" (March 2, 2010, Decision at 17) as required by

the CBA and MOAs are unfounded because any such failure was due to Respondents' customers'

failure to provide bus route information sufficiently early for a "pick" to be held, and that in any

event Respondent eventually met with a Union representative to discuss the summer route

assignments and thus discharged its obligations with respect to these routes.  (Resp. at 18.)

Respondent misconstrues its obligations under the CBA and ignores the ALJ's findings on this

point.  Simino, the Union representative, testified that he was denied two meetings with Gillison

in early June, and that he was provided insufficient information at the late-June meeting to

meaningfully evaluate the available bus routes.  (Part 5 at 593:13-612:24.)  The ALJ found that

the late June 2008 meeting after which Respondent provided partial information to the Union

was insufficient to satisfy Respondent's obligation under the CBA to post information about

"routes, including summer routes, . . . for bid on the basis of employee seniority" because, by

mid-June 2008, Respondent had obtained the relevant information from its customers –

representatives from various summer camps – and had "already assigned employees to the

summer routes" without notifying the Union or giving employees an opportunity to bid for these

routes.  (March 2, 2010, Decision at 17.)  This evidence, along with the ALJ's findings, provides

---

    [4]    The Court notes that the ALJ also found, and Respondent does not specifically
contest, that Gillison's suspension of Uchofen in March 2008 "was actually motivated
by Uchofen's decision to seek representation from union agent Simino," and that
Gillison "pretty much admitted" as much in an affidavit given "to a Board agent
during the investigation of this charge."  (March 2, 2010, Decision at 11.)

reasonable cause to believe that Respondent's conduct with respect to assignment of summer 2008 routes violated Sections 8(a)(1) and (5) and 8(d) of the NLRA.

Respondent faults the ALJ for failing to identify the Union requests for "step two" meetings to which Respondent refused to respond.  (Resp. at 18-19.)  While the ALJ's decision does not expressly identify the specific step two requests by the Union, he noted the requests in the section of his decision in which he discussed the 2008-09 school year route assignment process, which took place principally in the fall of 2008.  (March 2, 2010, Decision at 18.)  The passage clearly refers to two requests by Simino to hold step two meetings with respect to four then-pending grievances concerning claims of underpayment.  (See Part 2, G.C. Exs. 73 (letter dated September 30, 2008, from John Simino to Gideon Tikton requesting step two meetings regarding two categories of grievances, including employee underpayment), 74 (letter dated October 31, 2008, from John Simino to Gideon Tikton and Tom Gillison listing six grievances, noting that the first two had been addressed at a step two meeting, and requesting step two meetings as to the other four); Part 5 at 636:7-13 (Simino's testimony that he received no response to his October 31, 2008, letter).)  The ALJ found that Respondent had indeed refused to meet with the Union regarding the grievances as to which the Union sought step two meetings and concluded that Respondent thus had violated Section 8(a)(1) and (5) of the NLRA.  The evidence adduced at the hearing provides reasonable cause to believe that the ALJ's conclusion is correct.

Respondent also challenges the ALJ's findings with respect to the August 2008 route pick for the 2008-09 school year.  (Resp. at 19.)  Respondent argues that the ALJ misinterpreted Gillison's August 28, 2008, letter to Simino responding to Simino's letter of the same date challenging the alleged exclusion of certain bus routes from the pick process.  (Part 1,

G.C. Ex. 25.)  While it is true that Gillison prefaced his explanation with the statement that "there were no routes closed off the pick[;] [a]ll Irvington, Dobbs Ferry, and Westchester County routes were posted on the board with all other contract routes during the entire route pick" (id.), the ALJ correctly noted that Gillison went on to "essentially admit[] that the Irvington, Dobbs Ferry, and Westchester County routes, along with one route for the Ursuline School, were assigned by means other than the bidding/seniority process" and that "the drivers and monitors [who] had done these routes in previous years were either assigned to or given preference over anyone else, irrespective of seniority."  (March 2, 2010, Decision at 20.)  The ALJ went on to hold that "[t]he reason for eliminating those routes is not relevant as there is no question but that the routes, under the terms of the contract, were required to be posted for bid by seniority" and that as a result the "violation[] of the terms of the labor agreement w[as] clear and unequivocal and . . . that Respondent had no sound arguable basis for its failure to follow its terms," as might otherwise have been permitted pursuant to AlliedSignal Aerospace, 330 NLRB 1201, 1203 (2003) (explaining that an employer who has a sound arguable basis for his interpretation of the contract may act in accordance with his interpretation), set aside on other grounds by Honeywell Intern., Inc. v. N.L.R.B., 253 F.3d 119 (D.C. Cir. 2001).  (March 2, 2010, Decision at 25.) Respondent does not challenge this aspect of the ALJ's decision, and the Court finds that there is reasonable cause to believe that Respondent failed to post all routes for the 2008-09 school year and that such failure violated Sections 8(a)(1), (5) and 8(d) of the NLRA.

Respondent disputes the ALJ's finding that Respondent dealt directly with employees, in violation of Section 8(a)(1) and (5) of the NLRA, when it solicited statements from the employees concerning tool allowances and bus route picks.  (Resp. at 20-21.)  "An employer violates Sections 8(a)(1) and (5) of the Act by dealing directly with union-represented

employees concerning any mandatory subject of collective bargaining." Stroehmann Bakeries, Inc. v. N.L.R.B., 95 F.3d 218, 223 (2d Cir. 1996) (citing Medo Photo Supply Corp. v. N.L.R.B., 321 U.S. 678, 684 (1944)).  A direct communication with a union-represented employee made "for the purpose of establishing or changing wages, hours, and terms and conditions of employment or undercutting the Union's role in bargaining" constitutes direct dealing. Permanente Medical Group, Inc., 332 NLRB 1143, 1144 (2000).  Respondent contends that, because Gillison did not draft the letters concerning the tool allowances, which were signed by a number of mechanics (Part 2, G.C. Ex. 51), and stated that the signatories had received the tool allowance that was the subject of a then-pending grievance, there is no evidence that "Respondent had bypassed the Union and directly dealt with the employees regarding their tool allowance."  (Resp. at 21.)  Respondent misapprehends the ALJ's findings.  The ALJ found that "the evidence establishes that the company, by asking employees to sign the . . . letters[,] was engaged in 'direct dealing' . . . [because] there was a dispute as to whether or not the mechanics were paid the tool allowances in accordance with a previous grievance settlement" and, thus, Respondent "was, in effect, seeking to induce employees, in the absence of union representation, to waive any claims that they might have pursuant to the settlement."  (March 2, 2010, Decision at 30.)  In other words, it was not the drafting of the letters, but rather their solicitation, that constituted the unfair labor practice.  There is ample evidence in the form of Gillison's own testimony, which Respondent does not challenge, that Gillison did indeed solicit such letters from the mechanics.  (Part 6 at 1342:3-21.)  Nor does Respondent dispute that the letters potentially waived claims that the mechanics may have had pursuant to an earlier settlement agreement regarding tool allowances.  Such solicitation alone suffices to create reasonable cause to believe that Respondent engaged in direct dealing in violation of Section 8(a)(1) and (5) of the

NLRA.

Similarly, Respondent concedes that in December 2008 Gillison solicited "confirm[ation]" from employees that they had freely chosen their 2008 summer routes. (Resp. at 21.) As the ALJ noted, arbitration regarding the conduct of the assignment of those routes was then pending. (March 2, 2010, Decision at 31.) Respondent explains that "this was purely a defense mechanism against the numerous unsupported charges filed by the Union's representatives" and that it "did not want the Union to file another self-serving grievance." (Resp. at 21.) In communicating directly with employees Respondent sought, by its own account, to undermine the Union's ability to enforce the CBA's seniority provisions. The ALJ therefore had reasonable cause to find that Respondent engaged in direct dealing in soliciting the statements regarding the Summer 2008 route pick.

Respondent takes issue with the ALJ's finding that Respondent "violated Section 8(a)(5) of the Act by refusing to furnish the information requested in the Union's May 21, 2009[,] letter except for [certain financial information]" (March 2, 2010, Decision at 37),[5]

_____

[5]     As the ALJ explained, Section 8(a)(5) requires parties to a collective bargaining agreement to furnish information needed by the other party in order to properly perform its duties. (March 2, 2010, Decision at 26 (citing N.L.R.B. v. Acme Industrial Co., 385 U.S. 432 (1967) and discussing the kinds of information relevant to parties' contract responsibilities).) Respondent does not challenge the relevance of the information requested by the Union, and that information, as limited by the ALJ, was plainly discoverable under governing law. See Acme Industrial Co. 385 U.S. at 435-46 ("There can be no question of the general obligation of an employer to provide information that is needed by the bargaining representative for the proper performance of its duties."); New Surfside Nursing Home, 330 N.L.R.B. 1146, 1148-49 (2000) ("It is well-established Board law that names of employees, their classification, hours and wages, addresses, dates of hire, fringe benefits, and date and amount of last wage raise are related to the employees' terms and conditions of employment and are thus presumptively relevant information for the purpose of collective bargaining. An employer, therefore, on the union's request, must furnish this information to the union.").

because on June 5, 2009, Respondent's counsel responded to the Union's information request "by stating that the Respondent had been out of the country and that Respondent's counsel would call the Union's attorney upon his return."  (Resp. at 21-22.)  The ALJ expressly acknowledged Respondent's June 5, 2009, letter, but also noted that the CBA had been due to expire on June 30, 2009, that the Union had followed up on its May 21, 2009, letter seeking to schedule a bargaining meeting with two letters and two telephone calls and that, when Respondent finally responded on June 5, 2009, it not only claimed to be unavailable until June 14, 2009, but also raised an objection to Cesar Uchofen's participation in the contract negotiation.  The ALJ observed that

> by early June 2009, [Respondent] had not responded to the Union's request for bargaining information, and had not responded to the Union's requests for bargaining dates.  By letter dated June 5, [Respondent's counsel] informed the Union that the owner would be out of the country until June 14 and further stated that it objected to the Union picking Uchofen to be on its negotiating committee.  To me this is beginning to look like [Respondent] is trying to run out the clock until the contract's expiration date.

(March 2, 2010, Decision at 34.)  Indeed, after a meeting on June 18, 2009, which ended prematurely when Respondent walked out when the Union's representative refused to provide a copy of the notes from which he was reading, the contract expired on June 30, 2009, without further bargaining and Respondent effectively withdrew recognition from the Union.  That Respondent's counsel sent a letter – one that provided none of the information sought by the Union in connection with the bargaining process and that raised issues further complicating the bargaining process – does not diminish the strength of the evidence of record that creates reasonable cause to believe that Respondent's failure to provide the requested information to the Union violated Section 8(a)(1) and (5) of the Act.

Relatedly, Respondent contests the ALJ's finding that its "refusal to accede to the

Union's choice of having [Cesar Uchofen] as one of the people on its bargaining committee . . .

violated Section 8(a)(1) and (5) of the Act."  (March 2, 2010, Decision at 38.)  Respondent

agrees that the ALJ used the proper legal standard in determining whether Respondent's refusal

was justified.  That standard is set forth in <u>Pan American Grain Co.</u>, where the NLRB explained

that

> each party to a collective-bargaining relationship has both the right to select
> its representative for bargaining and negotiations and the duty to deal with
> the chosen representative of the other party.  A party's right to select its
> representative, however, is not absolute, and the other party is relieved of its
> duty to deal with a particular representative when that representative's
> presence would render collective bargaining impossible or futile.  The test is
> whether there is persuasive evidence that the presence of the particular
> individual would create ill will and make good-faith bargaining impossible.

343 NLRB 205, 206 (2004) (internal quotation marks and citations omitted).  However,

Respondent argues that it properly refused to deal with Uchofen: "because of his bias and

because of the fact that [Respondent] has had to call the police on no less than two (2) occasions

to remove him from the business grounds" (Resp. at 22 (citing Respondent's counsel's letter of

June 5, 2009, objecting to Uchofen's presence)); because Uchofen made "allegations of threat

and assault with no basis in fact" (<u>id.</u> at 23); because he showed "utter contempt for management

. . . before all of the employees" during the administration of employee physical examinations

(<u>id.</u>); and because he engaged in "anti-Semitic behavior (which the ALJ characterized as 'the

portrayal of Jews as rats was a stereotype utilized by the Name [sic] regime in Germany[')]" (<u>id.</u>).

Respondent grossly mischaracterizes the record, and cites only its counsel's June

5, 2009, letter to the Union in support of these accusations against Uchofen.  The ALJ found that

"[Uchofen's] conduct [at the physical examination] or any other occasion was not so egregious as

to warrant the Respondent's refusal" to deal with him as a union representative.  (<u>Id.</u> at 38.)

Similarly, while Respondent did indeed call the police twice in connection with Uchofen, Respondent points to no indication that those incidents involved conduct more egregious than mere disruption – indeed, one of these calls to the police occurred when Uchofen disrupted the physical examination process, and even in that instance he was permitted to remain on the property (although not inside the examination trailer) and to continue to distribute union literature outside the trailer.  As explained above, there is reasonable cause to believe that Uchofen was assaulted by Gillison, and Uchofen's allegation to that effect is therefore not without a basis in fact.  Finally, Respondent's assertion that Uchofen engaged in anti-Semitic conduct, or that the ALJ so found, is utterly inconsistent with the record.  The Union's use of an inflatable rat in connection with its dispute with Respondent is unremarkable in light of the fact that "[u]nions have been using inflatable rats for almost twenty years and have found them to be effective tools for publicizing disputes with employers."  Tzvi Mackson-Landsberg, Note, Is a Giant Inflatable Rat an Unlawful Secondary Picket Under Section 8(b)(4)(ii)(B) of the National Labor Relations Act?, 28 Cardozo L. Rev. 1519, 1524 (2006).  The ALJ noted, "[f]or whatever it is worth," in response to Gillison's contention that the use of the inflatable rat "was [a] disrespectful racial gesture," that Respondent's owner is Jewish and that Nazis had portrayed Jews as rats.  (March 2, 2010, Decision at 9 n.5.)  Contrary to Respondent's contention, the ALJ did not endorse Gillison's interpretation of the use of the inflatable rat, and neither the record before the Court nor the history of the use of inflatable rats in labor disputes supports that interpretation.  In short, there is no "persuasive evidence" that Uchofen's presence during bargaining would have "create[d] ill will and ma[d]e good-faith bargaining impossible," Pan American Grain Co., 343 NLRB at 206, and thus there is reasonable cause to believe that Respondent's refusal to deal with Uchofen was a labor law violation.

Respondent does not specifically contest several other ALJ findings of violations, namely that Respondent improperly: "suspend[ed] Cesar Uchofen because he sought union representation in relation to an interview that he reasonably believed could have led to disciplinary action" in violation of Section 8(a)(1) and (3) of the Act (March 2, 2010, Decision at 41); "fail[ed] to furnish relevant information so that the Union could carry out its contract administration functions in relation to the seniority bidding process for routes" in violation of Section 8(a)(1) and (5) of the Act (id.); "fail[ed] and refus[ed] to furnish to the Union[] information relevant to potential and actual grievances" in violation of Section 8(a)(1) and (5) of the Act (id.); "withdr[ew] recognition from the Union in the absence of a demonstrated showing that the Union has lost its majority status" in violation of Section 8(a)(1) and (5) of the Act (id. at 42);[6] and "unilaterally and without bargaining with the Union, ma[de] changes in the terms and conditions of employment after its collective bargaining agreement expired" in violation of Section 8(a)(1) and (5) of the Act (id.).[7]  As with the other matters on which Respondent has challenged the ALJ's findings, the Court concludes, on the basis of the entire record, that there is reasonable cause to believe that the violations in question were committed.

Appropriate Relief

Having determined that there is reasonable cause to believe that Respondent has committed unfair labor practices, the Court now considers whether the relief requested by

---

[6]     While Respondent does not contest this finding, Respondent does challenge the ALJ's predicate finding that any employee disaffection from the Union was caused by Respondent's earlier unfair labor practices.  For the reasons discussed below in connection with the "just and proper" requirement, the Court finds that there is reasonable cause to believe that Respondent did cause any such employee disaffection, and therefore that Respondent committed the unfair labor practice at issue.

[7]     See supra note 6.

Petitioner is just and proper.  "In this Circuit, injunctive relief under § 10(j) is just and proper

when it is necessary to prevent irreparable harm or to preserve the status quo."  <u>Inn Credible</u>

<u>Caterers, Ltd.</u>, 247 F.3d at 368 (citations omitted).  "[T]he appropriate status quo in need of

preservation is that which was in existence before the unfair labor practice occurred."  <u>Id.</u> at 369.

Where a "contested . . . letter in which a majority of [company] employees purportedly expressed

a collective desire not to be represented by the Union" puts the Union's majority support in

question, "the question is whether . . . [there is] reasonable cause to believe that [the company]

had a duty to bargain with the Union before the letter was received. If it did, then lack of

employee support afterwards is no defense to a violation of that duty."  <u>Id.</u> at 370.  Thus, where

there is "reasonable cause to believe that [the company] committed an unfair labor practice

before the [employee lack of support] letter . . . the appropriate status quo to be preserved was in

existence prior to [the company]'s receipt of the [employees'] letter" and "the letter is irrelevant

to the inquiry whether § 10(j) relief is just and proper."  <u>Id.</u>

     The petition purporting to demonstrate the employees' lack of support for the

Union was submitted to the N.L.R.B. Regional Office on June 15, 2009,[8] and several employees

communicated the petition's existence to Respondent the following day.  (Part 3, R. Ex. 6A

(letter dated June 16, 2009, from employees addressed to Tiktin and Gillison relaying their

attempt to deliver the petition on June 15, 2009, to the N.L.R.B.), R. Ex. 6B (decertification

---

[8]    As the CBA was due to expire on June 30, 2009, the ALJ correctly found that the June
15, 2009, petition to decertify the Union was untimely under long-established Board
rules that provide for a "contract bar" which prohibits an employee petition to oust an
incumbent union except during the period between 90 and 60 days prior to the
expiration of the contract or after the expiration of the contract if no new contract is
reached with the incumbent union.  (March 2, 2010, Decision at 38.)  <u>See</u> <u>Leonard</u>
<u>Wholesale Meats, Inc.</u>, 136 NLRB 1000 (1962).

petition).)  These events were preceded by nearly all of the unfair labor practices alleged by

Petitioner, and the appropriate status quo in need of preservation is that which existed prior to the

commencement of Respondent's unfair labor practices, long before the June 2009 decertification

effort.  In light of the many unfair labor practices that the ALJ found to have been committed,

and that the Court has found there is reasonable cause to believe occurred, it is highly unlikely

that the preexisting status quo can be reestablished and preserved absent the granting of the

Section 10(j) relief sought by Petitioner.  Such relief is therefore necessary.

     Furthermore, the ALJ found, and based on the record there is reasonable cause to

believe, that "Respondent's unfair labor practices tended to have the probable effect of

undermining the Union in the eyes of the bargaining unit employees" and were "a proximate

cause for any disaffection that employees may have had with the Union."  (March 2, 2010,

Decision at 39.)  The factors used to determine whether a employer has caused a union to lose

majority support, so as to render the employer's withdrawal of recognition from the union

unlawful, are

> (1) the length of time between the unfair labor practices and the withdrawal
> of recognition; (2) the nature of the violation, including the possibility of a
> detrimental or lasting effect on employees; (3) the tendency of the violation
> to cause employee disaffection; and (4) the effect of the unlawful conduct
> on employees' morale, organizational activities, and membership in the
> union.

In re Penn Tank Lines, Inc., 336 NLRB 1066, 1067 (2001) (citing Master Slack Corp., 271

NLRB 78, 84 (1984)).  Respondent's assignment of bus routes for the summer 2008 and 2008-09

school year in a manner inconsistent with the seniority and posting/bidding provisions of the

CBA concerned central terms and conditions of employment having to do with employee

compensation and hours of work.  Respondent's further inhibition of the Union's ability to

monitor Respondent's compliance with, or to enforce, those provisions of the CBA prevented the

Union from fulfilling some if its most important functions.  Similarly, Respondent's direct

dealing with employees for the purpose of neutralizing the Union's ability to remedy earlier

unfair labor practices impaired the Union's effectiveness and likely tended to cause employee

disaffection and to suppress employee morale and organizational capabilities.  See Goya Foods

of Florida, 347 NLRB 1118, 1122 (2006) ("Respondent's unilateral changes in drivers' routes,

salesmen's store assignments, radio phone policy, and emergency leave policy; its increased use

of temporary drivers; and its refusal to recognize union-designated representatives are also the

types of violations likely to have a lasting and negative impact on employees' support for the

Union").[9]  There is reasonable cause to believe, as the ALJ did, that these practices caused the

loss of support that the Union may have suffered.  Respondent's contention that it did not directly

solicit the signatures on the decertification petition is irrelevant.

In light of the existence of reasonable cause to believe that Respondent has

engaged in pervasive unfair labor practices that preceded the Union's alleged loss of support and

Respondent's subsequent unlawful withdrawal of recognition from the Union and unilateral

changes to terms and conditions of employment, combined with the causal connection between

Respondent's practices and the employee disaffection, the Court concludes that the Union is

likely to continue to lose support absent the temporary injunctive relief sought by Petitioner.

Such relief includes an affirmative requirement that Respondent recognize and bargain in good

---

[9]     Respondent does not acknowledge that an employer who causes a union's loss of
support may not rely on that loss, but rather relies on N.L.R.B. v. B.A. Mullican
Lumber and Mfg. Co., 535 F.3d 271 (4th Cir. 2008), a Fourth Circuit case that makes
no mention of employer-caused loss of support and that turned only on the question
of whether the employer had met its burden of showing actual loss of majority
support.

faith with the Union upon request, pending final resolution by the Board of the underlying

dispute.  See Palby Lingerie, Inc., 625 F.2d at 1055 (noting that a temporary injunction including

an interim bargaining order is appropriate where "later Board approval of th[e] findings [of unfair

labor practices] will come at a time when those violating the Act might have been able to

'accomplish their unlawful objective before being placed under any legal restraint.'" (quoting S.

Rep. No. 105, 80th Cong., 1st Sess. 27 (1947))); Inn Credible Caterers, Ltd., 247 F.3d at 368-69

("'the district court has the power to order immediate bargaining to prevent irreparable harm to

the union's position [at the company], to the adjudicatory machinery of the NLRB, and to the

policy of the Act in favor of the free selection of collective bargaining representatives'" (quoting

Seeler v. Trading Port, Inc., 517 F.2d 33, 39 (2d Cir. 1975))).  The requested relief is necessary to

prevent irreparable harm to the Union's position at the company and, being tailored to the

violations and thus focused on measures designed to restore the status quo ante by ameliorating

the effect of those violations on the Union's support and efficacy, is in all other respects just and

proper.

## CONCLUSION

For the foregoing reasons, the Court holds that there is reasonable cause to believe that Respondent has committed numerous unfair labor practices and that the temporary injunction sought by Petitioner is just and proper because it is necessary in order to prevent irreparable harm and to restore the appropriate status quo.  An order granting necessary and appropriate injunctive relief will be entered separately.


Dated: New York, New York
     May 12, 2010

LAURA TAYLOR SWAIN
United States District Judge